## Crist v. Director General of Railroads.

*Practice, C. P.—Rule for new trial—Depositions—Non-suit—Negligence.*

1. A rule for a new trial on account of after-discovered evidence may be engrafted on a motion to take off an order of compulsory non-suit.

2. In such case the court may, in its discretion, hear or reject depositions filed in support of a new trial.

*Negligence — Railroads—Walking longitudinally on tracks — Evidence— Non-suit—Contributory negligence.*

3. In an action against a railroad company to recover damages for death of plaintiff's husband, killed at night on defendant's tracks without any one having seen the accident, where plaintiff claims that the accident happened at a street crossing, a non-suit will not be taken off where the evidence at the trial, and depositions taken thereafter, show that the body was found on the tracks south of the crossing, but that blood was found immediately after the accident on the tracks north of the crossing, indicating that the deceased was walking on the tracks at a point north of the crossing when killed.

Motion to take off compulsory non-suit, and rule for new trial. C. P. Crawford Co., Sept. T., 1919, No. 59.

*Arthur L. Bates,* for plaintiff; *George F. Davenport,* for defendant.

PRATHER, P. J., July 5, 1921.—Plaintiff's husband was killed on the tracks of the defendant company Jan. 9, 1918, at about 9 o'clock P. M., at or near a grade crossing, the intersection of Poplar Street with defendant's tracks, by an engine backing down southwardly.

The facts presented at the trial touching decedent's employment and whereabouts on this evening immediately prior to the accident, and the probable course of travel to his home, are substantially these:

Decedent was an engineer on defendant's railroad, and lived in the village of Kerrtown, somewhat southward of the City of Meadville. On the evening in question he was at the Moose Club, in Meadville, for some two and one-half hours, and up to "pretty close to 9 o'clock." His wife had notified him during this period by telephone that he was called out on his run, and he left the Moose Club presumably to go to his home. So far as the testimony went, nobody knew what route he took to go home, and no one saw him after he left the Moose Club until about 10 P. M., when his mutilated and dismembered body was found south of Poplar Street on the railroad tracks.

Depositions were taken on the rule for a new trial, and a map of the city was offered in evidence before the commissioner.

From the testimony offered at the trial and from the map before us, it appears that the railroad tracks of the defendant on the west, Water Street

1 D. & C.

on the east, Mead Avenue on the north and Poplar Street on the south, enclose a quadrilateral. The Moose Club is within 100 feet from the railroad tracks, near the northwest corner of the figure, and about 500 feet from Water Street. The home of the decedent is southwest of this club, across and west of the tracks, and still further south and west of the intersection of Poplar Street with the main tracks of defendant company.

The route from the Moose Club to decedent's home by way of the railroad track would be approximately 900 feet shorter than the route eastward from the club over Mead Avenue to Water Street, thence south along Water Street to Poplar Street, and thence westward along Poplar Street, thence by West Street. Going south from Mead Avenue along Water Street, the next intersecting street leading west is Pine Street. This street also leads to the railroad, thence along the railroad to West Street and to decedent's home.

From the testimony of Forbes, it appears that the railroad track north and south of Poplar Street was used as a thoroughfare by pedestrians, and especially between Poplar Street and Mead Avenue.

From the testimony of plaintiff, it appears that it was not an unusual thing for her husband to travel the railroad track going from their home to Mead Avenue. To the question as to whether decedent did not generally go up and down the railroad tracks from Mead Avenue to Poplar Street, plaintiff answered (page 28): "If he was going to work and had a late call, I have heard him say that he would take the shorter route to the round-house, but never to go uptown. . . . Well, he would go right up West Street and up the Bessemer tracks and then across Mead Avenue up to the Erie depot."

Witness also testified that the shortest route from the Moose Club to decedent's home was to go down the Erie Railroad tracks. From near Mead Avenue to Poplar Street the Bessemer and the Erie Railroad tracks are contiguous to each other. Mr. Herrington testified that he had seen decedent at different times going north from Poplar Street on the railroads tracks and returning the same way.

Two witnesses testified that, after the accident, blood was found on the rails north of the north line of the intersection of Poplar Street and the railroad. One witness said ten or twelve inches north and another two feet north. Other witnesses observed blood further south, but they did not seem to have taken any observation for its northernmost appearance.

It is, therefore, clearly established by the testimony of the deputy coroner, Arthur Byham, and the testimony of Mr. Herrington, that blood of the decedent was found on the west rail of the railroad tracks at a point ten inches to two feet north of the north line of the Poplar Street sidewalk crossing.

At the end of plaintiff's case the court granted defendant's motion for a compulsory non-suit on the ground of contributory negligence.

Our action is sustained by all the authorities.

In Grant v. P., B. & W. R. R. Co., 215 Pa. 265, the Supreme Court states the rule: "If deceased was walking the tracks longitudinally, he was guilty of plain contributory negligence, and as the testimony was that he was in the habit of using both ways, the jury could only guess which way he took on that occasion. The plaintiffs, therefore, failed to show a case clear of contributory negligence." See Cawley v. B. & O. R. R. Co., 44 Pa. Superior Ct. 341; Terry v. D., L. & W. R. R. Co., 60 Pa. Superior Ct. 451; Gallagher v. B. & O. R. R. Co., 52 Pa. Superior Ct. 568; Welsh v. Erie & Wy. Val. R. R. Co., 181 Pa. 461.

After the trial, plaintiff filed her affidavit and obtained a rule to show cause for a new trial for after-discovered evidence.

Crist v. Director General of Railroads.

The deposition of John McBride, taken in support of said rule, is to the effect that he saw decedent, Marion Crist, on Water Street, opposite Arch Street, on the night of the accident at approximately 8.30 P. M., at which time decedent proceeded southward thereon toward home, with the declaration that he was going home, that he had been called.

Deponent's affidavit filed fixes the time a little more definitely at 8.30 than does his deposition.

Assuming this evidence to be true and that decedent did not return to the Moose Club, and that he did not adopt the Pine Street route from Water Street to the railroad and thence down the tracks to Poplar Street, there would be foundation for the legal inference that he adopted the Poplar Street route.

We are first to inquire whether a rule for a new trial on account of after-discovered evidence may be engrafted on a motion to take off an order of compulsory non-suit.

Counsel for defendant urgently insists that such a rule cannot prevail under any circumstances. Counsel for plaintiff seems just as confident that it can. But neither furnish any authority for their respective contentions.

We are convinced that it is within our discretion to hear or to reject the depositions filed in support of a new trial: Sidney v. Linton, 216 Pa. 240. We will exercise this discretion in favor of plaintiff by considering the facts presented in the McBride deposition as though presented at the trial. By so doing we realize we are challenging a close legal proposition arising therefrom.

We are next to inquire whether, under the facts so modified by this deposition, the plaintiff could have recovered. What are they? (a) We have decedent, at or about 8.30 P. M., on Water Street, going toward home, with the declaration he had been called out. From this point and while proceeding in this direction the route by Pine Street and thence down the railroad track to Poplar Street, the point of the accident, is quite as direct to his home as by the Poplar Street route. (b) We have decedent, according to the testimony of Forbes, at the Moose Club, where he told Forbes he was "first out and would have to go home." (c) We have him, by the testimony of Forbes, remaining there for twenty minutes longer, and remaining there till "pretty close to 9 o'clock, right around 9 o'clock." (d) We have the fact that the engine backing down south was moving at the rate of eighteen miles an hour, and that blood of decedent at the point of accident was found ten inches to two feet north of the north line of the Poplar Street sidewalk or crossing. (e) We have the fact that there was a well-defined path between the railroad tracks from Poplar Street north, used by the public. (f) We have the fact that decedent was a user of this shorter route from time to time. (g) We have the fact by De Venny's testimony that the engine that killed Crist backed down over the Poplar Street crossing at 8.40 P. M., and by the railroad fireman, Kightlinger, who was riding on the engine, it crossed this point at "about 9 o'clock in the evening." If Forbes's testimony is correct, that decedent left the Moose Club for home "pretty close to 9 o'clock," and McBride's testimony is true, that he saw him on Water Street some 600 feet from the Moose Club at 8.30, or shortly thereafter, decedent had fifteen or twenty minutes to get back to the Moose Club after McBride saw him. If the engine crossed Poplar Street at 8.40 o'clock, decedent might have retraced his steps to the Moose Club after McBride saw him on Water Street, and have gone down the railroad track to Poplar Street. If the engine did not in fact cross Poplar Street until 9 o'clock, as estimated by Kightlinger, then

decedent had ample time to return to the Moose Club upon any errand, and from thence go down the tracks.

Making due allowance for discrepancies in time, it must be conceded that, from McBride's testimony, decedent could reasonably have reached the scene of the accident by following Water Street to Poplar Street and thence on the regular crossing.

Aside from the possibilities of routes and deductions as to time, we are confronted with a probability as to the route decedent actually traveled, which arises from the undisputed testimony as to the northernmost point where appeared the blood stains in the snow at Poplar Street.

No matter how favorably to plaintiff we endeavor to construe all the other testimony, it does not blot out these blood stains—it still leaves them irreconcilably opposed to the theory that decedent came to his death while using the Poplar Street crossing.

It is fair to say that two or three of the witnesses observed blood on the line of intersecting travel, at different points north and south, on what might be considered the centre of the sidewalk belonging to said street. But it does not clearly appear that any of these looked for blood farther north than the north sidewalk line. Their testimony merely proved blood on the crossing and south therefrom. It did not answer, nor seek to answer, the inquiry whether there was blood farther northward. The answer cannot be construed beyond the observation of the witness; cannot be enlarged to prove a fact dependent upon observation, when the witness made no observation.

In the face of this we have the testimony of two witnesses, apparently friendly to plaintiff, and her own witnesses, who saw the blood north of the crossing. Arthur Byham, deputy coroner, testified that he found blood immediately following the accident on the west rail of the west track, ten or twelve inches north of the sidewalk. W. P. Herrington testified that he found blood two feet north of the crossing.

We ought, therefore, to accept it as a fact that blood was found north of the crossing, and from this fact it necessarily follows that decedent was not struck, run down or killed on the crossing, but at some point north of the crossing. And from this flows the inference that deceased must have been struck on the right of way of defendant company, several feet north of the street crossing. All of these facts compel the conclusion that deceased was walking the railroad, and not the street crossing, when he was struck, and, therefore, he was a trespasser and guilty of contributory negligence.

It seems beyond all reason and contrary to natural law if decedent, while walking on the crossing, was struck by an engine moving southward at eighteen miles an hour, that his blood could saturate the snow or visibly stain the iron rail of the track at any point north of the point of collision.

Considering the deposition offered and the facts supplied thereby as a part of plaintiff's proofs at the trial, we are not convinced that she has made out a *prima facie* case, free from decedent's contributory negligence. It, therefore, becomes our duty to deny the motion for a new trial and the motion to take off the order of compulsory non-suit.

Now, July 5, 1921, motion to take off compulsory non-suit is denied and overruled and discharged. Rule for new trial is discharged, and judgment is directed to be entered in favor of defendant company.

From Otto Kohler, Meadville, Pa.